**Richard Mark PAPILE, Petitioner,**

v.

**Charles P. HERNANDEZ, Superintendent, Taconic Correctional Facility, Respondent.**

**No. CV–87–1445.**

United States District Court,
E.D. New York.

Oct. 18, 1988.

---

Richard Mark Papile, Bedford Hills, N.Y., pro se.

William Schrager, Asst. Dist. Atty., Kew Gardens, N.Y., for respondent.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Petitioner Richard Papile, an inmate of Taconic Correctional Facility who is appearing pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Papile was convicted on February 14, 1983, after a jury trial in Supreme Court, Queens County, of the crimes of robbery in the first degree and criminal possession of stolen property in the third degree and was sentenced, as a second felony offender, to consecutive terms of seven to fourteen years and one year, respectively. The Appellate Division denied his appeal, *People v. Papile*, 113 A.D.2d 776, 493 N.Y.S.2d 366 (2d Dep't 1985), and on November 7, 1985, the New York Court of Appeals denied leave to appeal.

Papile also moved to vacate his judgment of conviction pursuant to N.Y.Crim.Proc. Law § 440.10. That motion was denied by the New York Supreme Court, Queens County, on May 14, 1986. On August 6, 1986, the Appellate Division denied Papile's

motion for permission to appeal the denial of his motion to vacate judgment.

On May 6, 1987, Papile filed a petition for federal habeas relief, asserting four grounds:

1) the trial court's failure to suppress identification testimony allegedly based on a tainted show-up procedure;

2) the trial court's failure to suppress testimony regarding incriminating statements made by Papile while he was in custody and after he had requested but not yet received counsel;

3) the trial court's failure to suppress evidence obtained as a result of an allegedly unlawful search and seizure; and

4) lack of sufficient evidence for a conviction.

## I. FACTS

At about 10:30 a.m. on July 1, 1982, Ms. Patricia Zask observed a blue car on the east curb of 259th Street near East Williston Avenue in Queens County, New York. (Tr. 208-17). The car, driven by a white man, turned right onto East Williston. Then Ms. Zask saw a black man carrying a black bag running up 259th Street toward the car. Because her view was obstructed by hedges, she did not see the black man get in the car. (Tr. 224). A couple of seconds later, she saw the car roll backwards around the corner onto 259th Street. The black man whom she had seen running was now in the car beside the white driver, and both were trying to steer the car. As she walked by on the opposite side of the street (Tr. 227), Ms. Zask saw the side of the white man's head, and then saw his entire face when he turned to glance at her. (Tr. 227, 249). In total, she viewed the white man's face for a full minute. (Tr. 252). Then she saw the black man leave the car, without the black bag, and run down 259th Street. The white man got out of the car and opened the hood.

Ms. Zask continued up 259th Street, and after a short distance noticed four rolls of pennies on the ground, which she put in her pocket. Reaching the intersection of 259th Street and Hillside Avenue, where a Burger King was located, she saw the restaurant's assistant manager, Joe Nunziata. (Tr. 228). Ms. Zask asked Nunziata whether he had just been robbed by a black man fitting the description of the person she had seen, and, receiving an affirmative answer, gave him the pennies. (Tr. 96, 212–13). When the police arrived at the Burger King, Ms. Zask told Officer Sidney Daniels that she had seen the black man run away, and that the white man (whom she described as dark-haired, white, and in his twenties (Tr. 237)) was still with the car on the corner of 259th Street and East Williston. She described the car as being a blue Firebird bearing a license plate that began with the numbers "612." (Tr. 218, 230, 122–23).

After speaking with Ms. Zask, Officer Daniels drove around the neighborhood looking for the car. At East Williston and 259th Street, he observed a blue Camaro, but the license did not start with "612." (Tr. 123).

Daniels returned to the corner of Hillside Avenue and 259th Street where he questioned Ms. Zask again. (Tr. 124). She repeated the same information. (Tr. 232–34). Then Officer Daniels was approached by a man, never identified, who advised him that the Camaro he had been looking at was being towed away. (Tr. 124).

Daniels returned to the site and found petitioner standing near the blue Camaro, which was up on a hook about to be towed away. *Id.* Petitioner was wearing work clothes and his hands were greasy, indicating that he had been working on a car. (Tr. 125). Daniels asked petitioner what was wrong with the car, and petitioner replied that he was having trouble with the steering. (Tr. 126). Daniels noticed that petitioner's hands were shaking and that he was nervous and sweating. (Tr. 125–26). Daniels asked the officer who was with him to run a check on the car's license plate. (Tr. 126).

At about this time, Ms. Zask, who had gone shopping, walked back down 259th Street. (Tr. 234–35). Daniels approached her and asked her whether she recognized petitioner, who was standing next to the

car with his hands behind his back, accompanied by the other police officer. (Tr. 237–39). She unhesitatingly confirmed that petitioner was the man she had seen driving the car. (Tr. 188, 245–46).

The other police officer then informed Officer Daniels that the plates on the car had been reported stolen. (Tr. 165). Officer Daniels asked the tow truck driver to lower the car. He looked inside it, saw a black bag behind the driver's seat, and removed it from the car. Mr. Franklin Adams, an employee of Burger King, identified the bag and the money inside it as having been stolen from Burger King. (Tr. 127).

Daniels placed petitioner under arrest and read him his *Miranda* warnings. (Tr. 128). He then opened the trunk with a screwdriver (which was possible because the lock cylinder already had been punched out), and found inside a set of license plates beginning with the numbers "612." (Tr. 130).

## II. DISCUSSION

### A. *Exhaustion/Unconstitutional Interrogation*

As a threshold matter, this court rejects the State's contention that Papile failed to exhaust one of his claims in the state courts. Therefore, the court will consider the petition on the merits rather than dismissing it, as the State urges, under the rule in *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

The applicable federal habeas statute states, in relevant part, that no writ shall issue "unless it appears that the applicant has exhausted the remedies available in the courts of the State ..." 28 U.S.C. § 2254(b).[1] The exhaustion requirement is

"principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," *Rose v. Lundy*, 455 U.S. at 518, 102 S.Ct. at 1203; *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), and requires that "petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney General of the State of New York*, 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Where the petition presents both exhausted and unexhausted claims, the United States Supreme Court has held that it must be dismissed. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. at 1199. After such dismissal, the petitioner must either delete or exhaust the unexhausted claims before resubmitting the petition. *Id.*, 455 U.S. at 520, 102 S.Ct. at 1204.

The State claims that Papile's petition must be dismissed because he failed to exhaust state remedies with respect to one of his four claims; namely, the violation of his right to counsel, which allegedly occurred when the trial court failed to suppress an incriminating statement he made while in custody and before receiving the legal representation he had requested.

At the time of his arrest, petitioner was given *Miranda* warnings, and stated that he did not wish to talk to the police in the absence of an attorney. Following arrest, while in custody at the police station, petitioner initiated a conversation with Detective Horace Balmer, offering to identify the black participant in the robbery if the Detective would let him go. (Transcript of October 27–28, 1982 *Wade/Huntley/Mapp* hearing ["H."] 79–80; Tr. 265–280).[2] At the

---

**1.** The exhaustion requirement is codified in 28 U.S.C. § 2254(b) and (c).

Section 2254(b) states, in its entirety:

An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of

circumstances rendering such process ineffective to protect the rights of the prisoner.

Section 2254(c) states, in its entirety:

An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

**2.** Detective Balmer testified at the suppression hearing as follows:

suppression hearing, defense counsel moved to suppress the incriminating statement on the ground that Detective Balmer had failed to give petitioner *Miranda* warnings before questioning him. (H. 201). Justice Glass ruled from the bench that the statement was spontaneous and thus admissible. (H. 215).

In opposing the instant petition, the State argues that because petitioner's brief to the Appellate Division cited no federal constitutional provision and instead relied exclusively on state constitutional law, petitioner "never afforded the state appellate courts the opportunity to pass upon any federal issues related to his claim that his statement was taken in violation of his right to counsel." State's Brief at 12–13.

█ The State's position is without merit. The Second Circuit has made it clear, with respect to exhaustion under § 2254(b), that the federal constitutional issue is "fairly presented" to the state courts whenever "the nature or presentation of the claim" is "likely to alert the court to the claim's federal nature." *Daye v. At-*

*torney General of the State of New York*, 696 F.2d 186, 192 (1982) (en banc). Here, the Appellate Division acknowledged that it had been "alert[ed] . . . to the claim's federal nature," because it cited the controlling federal Fifth Amendment case, *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1979), in support of its holding that Papile's statement was spontaneous.

█ Having found that this claim was exhausted, the court will not delay reaching its merits. The Appellate Division's reliance on *Rhode Island v. Innis* was not misplaced. That case controls this one, and requires denial of petitioner's claim.

*Innis* posed the question whether a conversation between two officers as they were driving an armed robbery suspect to prison was an interrogation triggering the suspect's *Miranda* rights. During that conversation, one officer expressed concern that the weapon used in the robbery might be found by handicapped children attending school in the area, perhaps resulting in a

Q  I call your attention to July 1st, 1982, Detective, at the 105 Precinct, did you have occasion to have a conversation with the Defendant in this case?
A  Yes, I did.
Q  Would you please describe the circumstances?
A  I was standing in the squad room there and he was incarcerated in the cell.
Q  How far away from you was he in the cell?
A  Few feet.
Q  What, if anything, occurred?
A  He called me over and said, he said, He wanted to make a deal. He asked me, what was—he asked me who I was and I told him I was a detective. He said he would like to make a deal. "What kind of a deal?" He said, "If they want the Black guy, I will give him up, but they got to let me go free."
Q  Detective, who instigated this conversation?
A  The Defendant.
Q  Had you asked him any questions whatsoever prior to his speaking to you?
A  No.
(H. 78–79).

*    *    *    *    *    *

Q  In other words, you proceeded to talk to him, question him, without giving him his warnings?
A  I didn't say I questioned him. I never said that. I said he asked me a question.
Q  What was the question?

A  He told me, he said, look, he asked me who was I and I told him I was a detective there and he said, "I want to make a deal." "What are you talking about?" He said, "They are looking for a Black guy who was supposed to have been with me. I will give that Black guy up if they let me go." I said, "There's no way possible that anybody is going to let you go." I said "what will probably happen is you will get consideration from the DA's office if you assist in this case, but you can't be let go." He said, "I don't want to talk no more."
(H. 83).

*    *    *    *    *    *

Q  Did you have any further conversation with the Defendant?
A  Well, as I was seated at my desk, he called me a couple of times from the cell and I asked him, what did he want, and he kept repeating, "You want the Black guy, you can get him if you just let me go." He was pleading almost like, "I will give you the Black guy if you let me go."
Q  What did you say?
A  I didn't talk to him anymore because of the fact there was no way possible that we were going to take a man and let him—give us one guy and let him go. The system doesn't work like that.
(H. 91–92).

fatal accident. The suspect then led the officers to the weapon. The Court found that the suspect had not been "interrogated" within the meaning of *Miranda:*

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *reasonably likely to elicit an incriminating response from the suspect.*

*Id.,* 446 U.S. at 301, 100 S.Ct. at 1689–1690 (emphasis added).

Here, as in *Innis,* no interrogation occurred. Prior to petitioner volunteering the incriminating statement, Detective Balmer (1) responded to petitioner's beckoning by walking over to petitioner's cell; and (2) responded to petitioner's offer of a deal by asking "What kind of a deal?" (H. 80). The Detective had no reason to think that his conduct was "reasonably likely to elicit an incriminating response ..." *Id.* Certainly, these facts do not carry even the slightest suggestion of the coercion, manipulation or trickery which concerned the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Accordingly, petitioner's first claim is denied, with prejudice.

### B. *In–Court Identification Based on One–Man Show–Up*

#### 1. Legal Standards

Petitioner argues that the trial court should have sustained his objection to Ms. Zask's in-court identification, on the ground that it was based on an unduly suggestive pretrial showup. The record[3] demonstrates that petitioner's claim lacks merit.

There is no question that Zask's pretrial identification of petitioner occurred under circumstances which were highly suggestive. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). However, petitioner has no constitutional right to a line-up; nor does an in-court identification without a prior line-up necessarily violate his rights. *United States v. Brown,* 699 F.2d 585, 593 (2d Cir.1983); *United States v. Estremera,* 531 F.2d 1103, 1111 (2d Cir.), *cert. denied,* 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976). "One-man show-ups that are conducted shortly after a crime has been committed are not per se violative of due process and evidence obtained through use of such an identification procedure is not necessarily inadmissible." *United States v. Howard,* 426 F.Supp. 1067, 1070 (W.D.N.Y. 1977) (one-man show-up at scene of crime admissible when viewed in the totality of the circumstances); *Snow v. Reid,* 619 F.Supp. 579, 582 (S.D.N.Y.1985) (same).

The Supreme Court and lower federal courts have upheld the admissibility of in-court identifications based on suggestive pretrial confrontations where, "under the 'totality of the circumstances' the identification [is found to be] reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The factors to be considered in assessing reliability of the pretrial show-up are:[4]

---

3. Although federal habeas corpus courts are required to defer to fair and reliable state findings of fact, 28 U.S.C. § 2254(d); *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759–760, 9 L.Ed.2d 770 (1963), the constitutionality of pretrial identification procedures poses a mixed question of fact and law, permitting the federal court to review the facts in the record and reach a conclusion different from the state courts. *Snow v. Reid,* 619 F.Supp. 579, 581 (S.D.N.Y. 1985), (citing *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–1307, 71 L.Ed.2d 480 (1982) (per curiam)).

4. *But see United States v. Bagley,* 772 F.2d 482, 492–93 (9th Cir.1985), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986) (unnecessary to apply five-part *Biggers* test for reliability, because one-on-one show-up at the scene of the crime was a "legitimate identification procedure") (relying on *United States v. Kessler,* 692 F.2d 584 (9th Cir.1982) (Kennedy, J.) ("[O]ne of the central and legitimate purposes of a [one-person] show-up is to sharpen the recollections of eyewitnesses and to enable them to focus on details they may have otherwise overlooked. That descriptions become more detailed after a suspect is displayed in a

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention;

(3) the accuracy of the witness' prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation. *Id.*, 409 U.S. at 199–200, 93 S.Ct. at 382–383; *see United States v. Ofarril,* 779 F.2d 791 (2d Cir. 1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986) (police officer's identification of defendants in a holding cell rather than in a line-up not impermissibly suggestive *per se* where officer had viewed defendants for several minutes during commission of crime, her description was confirmed by the arresting officer, and her post-arrest identification occurred shortly after the crime).

Against these "reliability" factors the court must weigh the "corrupting effect" of the suggestive procedure—*i.e.,* the degree to which the show-up exerted "pressure on the witness to acquiesce" in the identification. *Manson v. Brathwaite,* 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–2254, 53 L.Ed.2d 140 (1976); *accord Gonzalez v. Hammock,* 639 F.2d 844, 848 (2d Cir.1980), *cert. denied,* 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981).

### 2. Assessment of Reliability Factors

*Opportunity to view the criminal*—The events which Ms. Zask observed occurred outside at about 10:30 a.m. (Tr. 208). Ms. Zask testified that she observed petitioner's face from across 259th Street for a full minute. (Tr. 252). *See Gonzalez,* 639 F.2d at 847 ("short look" at defendant's face, of a "few seconds" in duration, from distance of three to four feet, was sufficient opportunity to view).

*Witness's degree of attention*—The record reflects that, although Ms. Zask was a bystander and not a victim of the crime (*see Chavis v. Henderson,* 638 F.2d 534, 537 (2d Cir.1980), *cert. denied,* 454 U.S. 842, 102 S.Ct. 152, 70 L.Ed.2d 125 (1981) (victim more likely to notice criminal's fea-

tures)), she paid close attention to the events in question. She observed and was able to give accurate descriptions of (1) the black man (Tr. 158, 210, 212–13, 48); (2) the bag carried by the black man (Tr. 158–59, 210); (3) the color of the car (Tr. 37–39, 123, 214); (4) the mechanical problem with the car's steering (Tr. 159); and (5) the first three numbers on the car's license plate (Tr. 122–23). The record furnishes no indication that Ms. Zask was subjected to any form of emotional or physical stress which might have distracted her attention.

*Accuracy of witness's description of petitioner*—Prior to the confrontation, Ms. Zask described petitioner as a dark-haired white man in his twenties. (Tr. 237). Her description, although less than exhaustive, appears to have been accurate. (Defendant's Exhibit B–2; Tr. 328). The Second Circuit has held that "absence of a detailed description in a situation where prompt police work permits little time for detailed inquiry" is not an indication of unreliability. *Chavis,* 638 F.2d at 537 (identification reliable although witness described defendant simply as "a black male wearing dark clothing").

*Level of witness's certainty at the confrontation*—Ms. Zask displayed complete certainty that the man indicated by Officer Daniels was the same man she had seen earlier. (Tr. 245–46.)

*Length of time between crime and confrontation*—Only twenty to twenty-five minutes elapsed between the time Ms. Zask first saw petitioner and the time Officer Daniels asked her whether petitioner was the white man she had described. (Tr. 240–41). *See Gonzalez,* 639 F.2d at 848 (one hour was a short enough period of time to support reliability of identification).

### 3. Assessment of "Corrupting Effect" of Show–Up

The "reliability factors" discussed above weigh heavily in favor of the admissibility of Ms. Zask's identification testimony. Against these factors must be weighed the "corrupting effect" of the show-up procedure.

show-up at a crime scene is intended as well as

expected.")).

The record, while ambiguous, at least raises the possibility that petitioner was handcuffed at the time Ms. Zask confront-ed and identified him. Ms. Zask testified that petitioner's hands were behind his back and that she had believed him to be in handcuffs, although she had not actually seen the handcuffs. (Tr. 238–39, 246). Officer Daniels testified that petitioner was not handcuffed at the time of the identification. (Tr. 167, 180–81). Even if petitioner was handcuffed at the time of the confrontation, however, that is not necessarily enough to outweigh the other indicators of reliability present in this case. *See Gonzalez*, 639 F.2d at 848 (where the five reliability factors were satisfied, the fact that witness was shown the defendant and codefendant handcuffed and by themselves in a room at the precinct house did not render the witness's identification testimony inadmissible); *Chavis*, 638 F.2d at 538 (identification of handcuffed defendant was admissible).

■ Also, there was conflicting testimony as to who initiated the identification. Ms. Zask testified that Officer Daniels asked her whether petitioner was the man she had seen, (Tr. 239–40), while Officer Daniels testifed that Ms. Zask volunteered the identification without being asked. (Tr. 165–66, 188). Even if Ms. Zask's account is the more accurate one, the court does not find that the "pressure on the witness to acquiesce" was sufficient to outweigh all the factors indicating that the identification was reliable.

Accordingly, the court finds no error in the admission of Ms. Zask's identification testimony, and denies petitioner's second claim, with prejudice.

### C. *Illegal Search and Seizure*

Petitioner claims that the police should not have searched the passenger compartment and trunk of the automobile because the car was not operable and was not in petitioner's possession. Rather, he claims that the police should have impounded the automobile.

■ Under *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976),

the court has no power to reach the merits of this claim. *Stone* held that a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial, unless the state denied that prisoner "an opportunity for full and fair litigation" of that claim. *Id.*, 428 U.S. at 494, 96 S.Ct. at 3052. In this circuit, "an opportunity for full and fair litigation" means that the state has provided all defendants with a "facially adequate procedure" for litigating Fourth Amendment claims, and that no "unconscionable breakdown" of that procedure occurred in the petitioner's specific case. *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 70 (2d Cir. 1983); *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir.1977) (en banc), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978); *Shaw v. Scully*, 654 F.Supp. 859, 863–64 (S.D.N.Y.1987). An "unconscionable breakdown" of the procedure is proven where petitioner demonstrates that "no state court ... conducted a 'reasoned method of inquiry into relevant questions of fact and law,' or any inquiry at all" into the Fourth Amendment claim. *Id.*, 654 F.Supp. at 864, (quoting *Cruz v. Alexander*, 477 F.Supp. 516, 523 (S.D.N.Y.1979)).

The federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim. Proc.Law § 710.10 *et seq.*, as being facially adequate. *Gates*, 568 F.2d at 837 & n. 4; *Shaw*, 654 F.Supp. at 864. Therefore, "federal scrutiny of [Papile's] Fourth Amendment claim[ ] is not warranted unless he demonstrates that he was in fact precluded from utilizing [the state procedure] by an unconscionable breakdown in the [state's] review process." *Shaw*, 654 F.Supp. at 864.

The record amply refutes any claim of an "unconscionable breakdown" in the process provided by N.Y.Crim.Proc.Law § 710.10 *et seq.* Petitioner availed himself of that procedure, and a hearing on the Fourth Amendment issue was held on October 27–28, 1982. At the conclusion of the hearing, the court announced its conclusions as to

that issue, making it clear that it had "conducted a 'reasoned method of inquiry into relevant questions of fact and law,'" *Shaw*, 654 F.Supp. at 864. (H. 214–15).

Accordingly, petitioner's third claim is denied, with prejudice.

### D. *Verdict Unsupported by Sufficient Evidence*

Petitioner claims that the verdict of guilt in his trial was unsupported by sufficient evidence. To be entitled to habeas relief on this ground, petitioner must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–2792, 61 L.Ed.2d 560 (1978). The Second Circuit has approved a similar formulation governing motions for a directed verdict of acquittal:

> The true rule ... is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

*United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972) (quoting *Curley v. United States*, 160 F.2d 229, 232–33 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947)); *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980).

■ Based on an independent reading of the entire record, the court concludes that petitioner has not shown that upon the evidence there "must be ... doubt in a reasonable mind" or that there is "no evidence" upon which a reasonable mind could base a finding of guilt beyond a reasonable doubt. While the testimony was in conflict on certain points (as ably demonstrated by defense counsel on motion to dismiss the indictment and in his summation, Tr. 281–92, 386–407), none of the conflicts significantly affected Ms. Zask's credibility or undermined her crucial testimony.

The court also finds the testimony of the defense witnesses completely insufficient to require a reasonable doubt on the part of a rational juror. Petitioner's defense was that his wife had abandoned his car at 258th Street and East Williston the night before due to mechanical failure, and that the proceeds of the robbery were placed in the car by unknown hands while he was away trying to locate a tow truck. As far as can be determined from the record, no credible evidence supported this theory.

Considering Ms. Zask's testimony, which was corroborated by the black bag full of stolen money and the "612" license plate found in petitioner's car, and adding to this the inculpatory statement which defendant volunteered to Detective Balmer at the precinct house, it cannot be said that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324, 99 S.Ct. at 2791–92.

Accordingly, petitioner's fourth claim is denied, with prejudice.

### CONCLUSION

For the reasons stated herein, petitioner application for a writ of habeas corpus is DENIED.

SO ORDERED.