**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4176

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ERIC JOHNSON,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Catherine C. Blake, District Judge.
(1:10-cr-00716-CCB-1)

Argued: September 17, 2013          Decided: October 29, 2013

Before WILKINSON, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion,
in which Judge Wilkinson and Judge Agee joined.

**ARGUED:** Thomas Edward Sarachan, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Greenbelt, Maryland, for Appellant. Debra Lynn Dwyer,
OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for
Appellee. **ON BRIEF:** James Wyda, Federal Public Defender,
Baltimore, Maryland, Lauren E. Case, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Rod J.
Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.

DUNCAN, Circuit Judge:

Eric Johnson entered a conditional plea of guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and was sentenced to 15 years' imprisonment. He appeals the district court's denial of his motion to suppress various statements he made to the police and evidence recovered from his home. For the reasons that follow, we affirm.

I.

On April 13, 2010, three members of the Baltimore City Police Department's Violent Crime Impact Section patrolled the Cold Spring area of Baltimore, Maryland, a neighborhood known for its high incidence of crime. According to one of the officers, Detective Jonathan Mackensen, this unit often stops motorists in such areas for minor offenses in the hope that these encounters will lead them to information about more serious crimes.

That night, the officers spotted a red GMC Jimmy weaving in and out of traffic and displaying a bent and illegible temporary registration tag. The officers pulled the vehicle over and approached the car.

Detective Damian Krauss asked the driver, Johnson, for his license and registration. Johnson handed Detective Krauss the

2

vehicle's registration card and a Maryland identification card, but stated that he did not have a driver's license.

At that point, Detective Krauss detected a faint odor of marijuana and discreetly communicated his suspicion to the other officers by sniffing his nose in the air. He then asked Johnson if the officers could search his vehicle. Johnson consented to the search. The officers found nothing in the vehicle but Detective Mackensen came to suspect that Johnson was hiding something in his mouth. Detective Mackensen told Johnson to "spit it out" and out came two small bags of marijuana. J.A. 117.

Johnson was then arrested, handcuffed, and placed in the back of the officers' unmarked car. He was not informed of his Miranda rights at that time. See Miranda v. Arizona, 384 U.S. 436 (1966). The officers waited for Johnson's father, the registered owner of the vehicle, to come and retrieve it. They then left for the police station with Johnson in the back seat. Johnson was never cited for the license plate violation.

While en route to the station, however, Johnson volunteered the following: "I can help you out, I don't want to go back to jail, I've got information for you." J.A. 122. Detective Mackensen replied, "what do you mean?," and Johnson responded, "I can get you a gun." Id. Detective Mackensen then gave Johnson a verbal Miranda warning and another officer, Sergeant

3

Brian Hopkins, advised Johnson not to say any more until they reached the station.

Upon his arrival at the station, Johnson was taken to an interview room. He was read a second Miranda warning and signed an Explanation and Waiver of Rights form. After Johnson signed the waiver, the officers returned to the discussion of the firearm that Johnson had initiated on the way to the police station. At that point Johnson told the officers that the weapon was in his home. He described the weapon and where in the house it could be found. Johnson signed a Consent to Search form. The officers then travelled with Johnson to his house and recovered the weapon from Johnson's bedroom closet. Johnson remained in custody and was eventually charged in federal court with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Johnson moved to suppress the weapon and other tangible evidence recovered in the search of his home, and to suppress his statements to the police. The district court held a hearing on these motions at which Johnson, his wife, Detective Krauss, Detective Mackensen, and Sergeant Hopkins testified.

Johnson and the officers testified about the state of Johnson's license plate the night he was stopped. Johnson testified that he was in the habit of checking his license plates before getting in the car because he lived in a

4

neighborhood in which temporary tags were often stolen. He testified that he followed his usual routine that night and noticed nothing wrong. Johnson also stated that there were two plastic tabs at the bottom of the tag that were designed to keep it "sturdy and straight." J.A. 237.

The officers, on the other hand, testified that the tag was bent in such a way that it could not be read at a distance. Detective Krauss and Sergeant Hopkins testified that the tag was bent up from the bottom while Detective Mackensen testified that it had been "folded over at the top." J.A. 106. All three were also asked, however, to demonstrate using a piece of cardboard how the tag was bent. The district court observed that all three officers folded the cardboard so that it curved up from the bottom. All three officers testified that they stopped Johnson's vehicle after they noticed that the tag was bent and illegible.

The district court found that the tag had indeed been bent and rendered illegible. It concluded that the officers had probable cause to stop Johnson's vehicle on that ground.

The district court went on to find that Detective Mackensen's asking Johnson "what do you mean?" in response to Johnson's voluntary statement was not the functional equivalent of an interrogation and, therefore, was not a Miranda violation. The district court concluded that Johnson was subsequently

5

apprised of his Miranda rights and waived them voluntarily by signing the Waiver of Rights form. It also found that he voluntarily consented to the officers' search of his home. The district court consequently denied Johnson's motions to suppress.

Johnson entered into a plea agreement with the government, preserving his right to appeal the district court's decision on the motions to suppress. He conditionally pleaded guilty and was sentenced to 15 years' imprisonment. This appeal followed.

II.

Johnson argues that the district court erred in concluding that the officers had probable cause to stop his vehicle, and he argues that Detective Mackensen's question, "what do you mean?," constituted an unwarned custodial interrogation in violation of Miranda. We consider each in turn.

A.

We first consider Johnson's contention that the officers' initial traffic stop was unreasonable and, thus, an illegal seizure under the Fourth Amendment. He argues that the district court's contrary conclusion rests on both an erroneous factual finding--that Johnson's registration tag was bent--and an error of law--that the stop was reasonable even if the officers used the bent tag merely as a pretext to make the stop.

6

We review the district court's factual finding for clear error, viewing the evidence in the light most favorable to the government. United States v. Hamlin, 319 F.3d 666, 671 (4th Cir. 2003). We review the court's legal conclusion de novo. Id.

## 1.

Johnson contends that the district court erred when it found that Johnson's tag was bent and illegible. Under the clear-error standard, "[a] factual finding by the district court may be reversed only if, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Walton v. Johnson, 440 F.3d 160, 173-74 (4th Cir. 2006) (en banc) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985). This is all the more true when the district court's finding was based upon its assessment of witnesses' credibility. See United States v. Springer, 715 F.3d 535, 545 (4th Cir. 2013).

At the suppression hearing, Johnson and the officers provided conflicting testimony about the state of the tag on Johnson's vehicle. In the face of such a conflict, the district

7

court's decision to credit the officers' testimony over Johnson's is a paradigmatic credibility determination which we do not disturb lightly. See id.

Johnson argues that the officers' testimony was belied by the fact that they did not seize the tag, photograph it, or issue a citation. But we find the officers' failure to take these steps much less illuminating than Johnson suggests. The scent of marijuana emanating from Johnson's vehicle gave the officers reason to investigate a more serious violation than an illegible tag almost immediately after the officers stopped him.

Johnson likewise seeks to impeach the officers' credibility by pointing out the inconsistency of their testimony about how the tag was bent. But although their verbal descriptions differed, their physical demonstrations were consistent. Moreover, the officers were unanimous on the general proposition that the tag was bent and illegible at a distance.

Johnson therefore presents nothing more than a competing version of the facts, a version that the district court was free not to credit. At the least, the evidence presented is compatible with "two permissible views," the choice between which followed from the district court's assessment of the officers' credibility. On the basis of this record we cannot conclude that the district court's finding was clearly erroneous.

Johnson also argues that the district court erred in concluding that the bent tag rendered the traffic stop reasonable. He contends that the bent tag was not the officers' true motive for stopping the vehicle, evidenced, in particular, by the fact that the officers did not pursue the matter further once the stop had been made.

A traffic stop is reasonable, and therefore not a violation of the Fourth Amendment, if it is justified by probable cause or reasonable suspicion. United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). This is an objective standard. Id. The standard is met, therefore, when officers observe a traffic violation, regardless of their true, subjective motives for stopping the vehicle. Whren v. United States, 517 U.S. 806, 810-13 (1996) ("[O]nly an undiscerning reader would regard [our] cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred."); Branch, 537 F.3d at 337.

Johnson, however, relies on United States v. Tibbetts, 396 F.3d 1132 (10th Cir. 2005), in which the Tenth Circuit held that "when police completely ignore the purported reason justifying the initial traffic stop, a court may consider that failure when evaluating the objective reasonableness of the stop under the

Fourth Amendment." Id. at 1139. Tibbetts therefore appears to contemplate that there may be a situation where, although officers have observed a traffic violation, a resulting traffic stop might nonetheless be held objectively unreasonable if the officers did not proceed to investigate the predicate violation. Johnson argues that his traffic stop is just such a situation.

But to the extent that Tibbetts provides for such an outcome it is incompatible with our precedent, for we have held that "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle." Branch, 537 F.3d at 335; see also United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). Thus, it is not relevant whether the officers proceed to take further action on the predicate traffic violation.

Maryland law requires that a vehicle's registration tags be clearly legible. Md. Code Ann. Transp. § 13-411(c). Therefore, having found that Johnson's license plate was illegible the night he was stopped, the district court properly concluded that the stop was reasonable. Regardless of their true motives, and whether they pursued the traffic violation, it was reasonable for the officers, who had observed the illegible tags, to stop Johnson's vehicle.

B.

We next examine Johnson's Miranda challenge. There can be no doubt that Johnson, handcuffed and seated in the back of a police car, was in custody at the time of his exchange with the officer. The issue is whether Detective Mackensen's question, "what do you mean?," after Johnson voluntarily proffered information, constituted a custodial interrogation.

The seminal case in this area is Rhode Island v. Innis, 446 U.S. 291 (1980). In that case, officers had arrested Innis for his suspected robbery of a taxicab driver. Innis was Mirandized and he invoked his right to counsel. But before he could consult with an attorney, Innis overheard officers discussing a sawed-off shotgun which had been used in the robbery but not recovered, and the risk it might pose to nearby school children. In response, Innis interrupted and led officers to the weapon. Id. at 293–95. At trial, however, Innis argued that the officers' conversation constituted a custodial interrogation in violation of Innis's right to remain silent until he had consulted a lawyer. Id. at 298.

The Supreme Court ultimately disagreed. It held that the Miranda rules only apply to police conduct that is the "functional equivalent" of an interrogation--that is, any conduct "that the police should know [is] reasonably likely to elicit an incriminating response." Id. at 299–301. The brief

11

remarks that passed between the officers, the court held, did not meet that requirement.  Id. at 302.

While the facts of Innis led the Court to emphasize the possibility of a Miranda interrogation without express questioning, it made clear that the opposite is also possible. There are questions that are not reasonably likely to elicit incriminating responses just as there are declarative statements or actions that are.*  The Miranda analysis does not turn on the form of an officer's articulation.

Moreover, Innis illustrates that a question might not be classified as an interrogation even if the question subjectively exerted a coercive effect on a suspect.  Id. at 302–03.  The suspect's subjective experience of the questioning is relevant only to the extent that it should have been anticipated by the officers such that they should have known that the suspect was reasonably likely to incriminate himself in response.  Id.

---

* See, e.g., United States v. Jackson-Forsythe, 498 F. App'x 224, 226 (4th Cir. 2012) (per curiam) (no interrogation when officers asked a suspect whether she was staying at a particular hotel); United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985) (no interrogation when, during a search of a suspect's home, the suspect informed officers that he could not take a spiral notebook and officers asked why); Papile v. Hernandez, 697 F. Supp. 626, 629 n.2, 631 (E.D.N.Y. 1988) (no interrogation when suspect volunteered "I want to make a deal" and officers asked "what kind of deal?"); Turner v. Sullivan, 661 F. Supp. 535, 537–38 (E.D.N.Y. 1987) (no interrogation when suspect volunteered "my leg is hurting" and officers asked "what happened to you?"), aff'd, 842 F.2d 1288 (2d Cir. 1988).

12

This test reflects a careful balancing of interests. Miranda, on one hand, counsels that meaningful enforcement of citizens' Fifth Amendment right against self-incrimination requires a subjective approach. Miranda recognized that the interrogation environment might render that right illusory by "subjugat[ing] the individual to the will of his examiner." Miranda v. Arizona, 384 U.S. 436, 457 (1966). To guard against this danger requires a court to consider the police's actions from the suspect's point of view. On the other hand, however, "the police surely cannot be held accountable for the unforeseeable results of their words or actions." Innis, 446 U.S. at 301-02.

The suppression remedy for Miranda violations further tightens the focus on foreseeability. "[T]he deterrent effect of suppression must be substantial and outweigh any harm to the justice system." Herring v. United States, 555 U.S. 135, 147 (2009). But to suppress evidence due to a question's or comment's coercive effect on a suspect, when that effect could not reasonably have been foreseen, would have no desirable deterrent effect at all. The only lesson an officer might draw from such an outcome would be that he himself should remain silent until a Miranda warning could be administered, lest his blunder cause a criminal to go free. See id. at 148.

13

The question Innis instructs us to ask is whether Detective Mackensen should have known that the query "what do you mean" was reasonably likely to elicit an incriminating response or, in other words, whether he should reasonably have foreseen that result. It bears reiteration that Detective Mackensen's question was in response to Johnson's undisputedly voluntary statement, "I can help you out, I don't want to go back to jail, I've got information for you." J.A. 122.

In the absence of facts suggesting otherwise, an officer would reasonably expect a defendant making such a proffer to be acting with some degree of self-interest. Here, the officers had every reason to believe at the outset that Johnson was doing precisely that. He was offering the officers something of value in the hope that it would keep him from going to prison. Given the purpose of the suggested bargain, a follow-up inquiry "what do you mean?" would not have seemed reasonably likely to elicit self-incriminating information, because Johnson's offering such information would have defeated the very purpose of the proposal. The query would reasonably be expected to elicit information incriminating someone else. But incriminate himself is exactly what Johnson did. He attempted to extricate himself from a misdemeanor by implicating himself in a felony.

Johnson argues that, his professed motivations notwithstanding, Detective Mackensen should have known that to

ask "what do you mean?" could at least possibly have elicited an incriminating response. But this sets the bar too low. It is possible, of course, that a suspect in custody could implicate himself in a criminal act in response to any question or action no matter how innocuous. If possibility were the standard, therefore, an officer would risk suppression whenever he spoke within earshot of an unwarned suspect. But Miranda was intended to protect suspects from coercive police practices, not render officers mute.

Innis itself demonstrates this problem as well as its solution. Its facts confirm that any passing remark might indeed carry some potential to elicit an incriminating response. And its holding confirms that more is needed to transform a question or comment into an interrogation--Innis rejects possibility in favor of foreseeability. See Innis, 446 U.S. at 303.

In sum, Innis teaches that when the police have no reason to expect that a question will lead a suspect to incriminate himself, that question cannot constitute an interrogation under Miranda. Under such circumstances they cannot be blamed for failing to anticipate a suspect's incriminating response and the threat of suppression could not plausibly deter them from eliciting it. We therefore agree with the district court that

the officers did not conduct an unwarned custodial interrogation on these facts.

There is therefore no need to consider whether, under Missouri v. Seibert, 542 U.S. 600 (2004), the officers' subsequent Miranda warnings were sufficient to ensure the voluntariness of Johnson's later statements to the police. Seibert addressed "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." Id. at 604. Because we hold that no interrogation had occurred before Johnson was Mirandized, Seibert is plainly inapplicable.

## III.

For the foregoing reasons, the district court's decision denying Johnson's suppression motions is

AFFIRMED.

16